# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 18, 2010

## STATE OF TENNESSEE v. THOMAS DAVID JOHNSON

**Direct Appeal from the Circuit Court for Marion County**
**No. 8085    J. Curtis Smith, Judge**

---

**No. M2009-01761-CCA-R3-CD - Filed November 24, 2010**

---

A Marion County jury convicted the Defendant, Thomas David Johnson, of attempted voluntary manslaughter, and the trial court sentenced him to three years, to be suspended after the service of sixty days in jail.  On appeal, the Defendant contends: (1) that the trial court erred when it denied his motion for judgment of acquittal; (2) that the trial court erred when it denied the Defendant's request for judicial diversion; and (3) that the trial court erred when it denied him full probation.  After a thorough review of the law and relevant authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES AND JERRY L. SMITH, JJ., joined.

Howell G. Clements and Paul Cross, Monteagle, Tennessee, for the Appellant, Thomas David Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel West Harmon, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Sherry Shelton and David McGovern, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
### I.  Facts
### A. Trial

This case arises from a dispute between the Defendant and the victim, which led to the Defendant twice striking the victim from behind with a metal fence post.  Based upon this

conduct, a Marion County grand jury indicted the Defendant for attempted first degree murder. At the Defendant's trial, the following evidence was presented:

Aaron Schaublin, a South Pittsburg Police Department officer, testified that the Defendant came into the police station the morning of February 2, 2007, complaining that his neighbors had been driving through his yard to access their own driveway. Officer Schaublin said the Defendant was "very agitated" and "irate" at this time. He spoke with the Defendant for about half an hour, during which time he told the Defendant that, if his neighbors continued to drive on his land, he could file and sign a report about his neighbors' trespass. The Defendant, however, declined to file a report, saying he did not want to drive back to the police station to fill out the necessary paperwork.

According to the officer, the Defendant said that, rather than file a report, he would instead "just take a pick ax handle and hit him[,] and when he fell on the ground[,] he would hit him in the head" if one of his neighbors entered his property again. The officer warned the Defendant against taking such violent measures, informing him that such conduct would result in the Defendant being arrested and charged. The Defendant told the officer to "take [his] time in getting there" if he received a report that something had happened at the Defendant's house, saying he would "turn himself in" when the officer arrived. Officer Schaublin continued to discourage the Defendant from reacting violently, suggesting that the Defendant instead build a fence. The Defendant agreed to do this and left the police station around noon.

About two hours later, shortly before 2:00 p.m., the officer received a call from the home of Wayne Privett, the Defendant's neighbor, requesting police assistance. He left, anticipating that the Defendant had followed through with his original plan to attack his neighbor. Indeed, when he arrived, bystander Luke Shrum informed him the Defendant and Wayne Privett had had an argument, the Defendant fled, and Privett went inside his home. The officer reported the Defendant's departure to police dispatchers, who informed him the Defendant had already turned himself in at the police station.

The officer followed a trail of blood, which began near the road, where the Defendant appeared to have been erecting a fence, continued up Privett's driveway and led to the back entrance to Privett's home. Officer Schaublin entered the back entrance and found Privett and his wife seated in their kitchen. He described Privett as "[a] mess," and said, "Blood was all over him. Mrs. Privett was holding a towel to his head. There was a trail of blood leading to the back door of the house." An ambulance soon arrived, as well as other officers who secured the scene. Officer Schaublin returned to the police station to interview the Defendant.

2

Back at the police station, the Defendant told Officer Schaublin that he and Privett began to argue, and, when Privett began "cussing" at the Defendant, the Defendant "got tired of it" and hit Privett with a fence post. At this point, the officer read the Defendant his *Miranda* rights and attempted to obtain medical treatment for the Defendant's hand, which had been cut during the course of using the fence post to strike Privett, but the Defendant refused treatment. The officer testified that the Defendant never asked the police to send medical attention for Privett, never expressed regret over attacking Privett, and never inquired about Privett's condition.

After taking the Defendant into custody, Officer Schaublin returned to the scene of the attack, where he found a fence post with blood splatter on the bottom "shovel" end and a drop of blood on the middle portion of the fence post. The officer photographed this fence post and collected a bloody towel the victim's wife had used to stop the victim's head from bleeding.

Officer Schaublin returned to the police station and escorted the Defendant to the Marion County Justice Center. While at the Justice Center, the Defendant neither expressed remorse nor inquired as to the victim's well being.

On cross-examination, Officer Schaublin said that, when the Defendant came to the police station complaining about his neighbors the morning of February 2, he did not ask the officer to confront his neighbors about their use of his property, and the officer did not volunteer to do so. The Defendant simply told the officer that he wanted to attack the individuals who he believed were trespassing on his property. After the officer discouraged him from this, telling him the only remedy was to file a warrant, the Defendant resolved instead to build a fence.

The officer agreed that the Defendant was "cool as a cucumber" when he, accompanied by his son, returned to the police station the afternoon of February 2, after attacking the victim. The Defendant immediately began telling Officer Schaublin what he had done, but the officer stopped him, advised him of his *Miranda* rights, and discouraged him from speaking further. The Defendant nonetheless continued to describe his role in the altercation, but his son convinced him to stop speaking. At this point, the officer placed the Defendant under arrest. He estimated this exchange with the Defendant lasted only fifteen to twenty minutes. The officer explained that the Defendant's statement was not recorded because, though the station has recording equipment, the equipment was not set up when the Defendant spontaneously gave his statement.

Dale Higdon, a fifty-five year old South Pittsburg Police Department officer, testified that he had known the Defendant since the officer was a young teenager. Officer Higdon

3

was not part of the February 2 investigation of this incident, but, when he learned of the incident, he recalled an encounter he had with the Defendant in early January 2007. Around 9:00 p.m. one night, Officer Higdon stopped the Defendant's vehicle for failure to use headlights. Once the Defendant and the officer realized they knew each other, they began to catch up, which led to the Defendant complaining to Officer Higdon that his neighbor, the victim, was keeping chickens in his yard. Officer Higdon was familiar with this issue because, about seven months before, the Defendant had visited the police department to complain about the victim keeping chickens.

The Defendant complained that the victim continued to keep chickens on his property and said that "if [the police] didn't do something about [the situation], he would." According to the officer, the Defendant became increasingly agitated and said that he would "bust [the victim] up side of the head and come turn himself in" if police "didn't do something about it." The officer also recalled the Defendant saying that he did not mind going to jail because he was "fed up" with the situation.

Officer Higdon did not make a formal report of the Defendant's threats that night. He did, however, make such a report after the Defendant attacked the victim a month later. Officer Higdon learned after the attack that the victim had already removed the chickens from his yard.

On cross-examination, Officer Higdon explained that, though he was aware that several complaints had been filed about the victim's chickens, he did not know who filed the complaints because he did not personally investigate the complaints. The officer also did not visit the victim's property to investigate the Defendant's allegations made during the January stop. Officer Higdon, who considered the Defendant a friend, said he knew the Defendant to be honest.

Lucas Shrum testified that he was sixteen at the time of the attack in this case and was babysitting at the home of Christy Hargis, who rented a house from the victim. This house was located on a lot between the homes of the Defendant and the victim. Shrum recalled that, early in the day, he saw the Defendant using a "post driver" to put a fence post in a portion of his yard, near the street, that abutted Hargis's yard. Later in the day, as Shrum watched from a window, he saw the victim walk through Hargis's yard to speak with the Defendant, who was still attempting to erect a fence. He recalled that the victim appeared "pretty calm." Shrum testified that the victim never crossed onto the Defendant's property during his conversation with the Defendant. Apparently able to overhear their discussion, Shrum said the men discussed "taking [the matter of the fence line] to court." According to Shrum, the victim was not carrying a weapon and never acted as though he were about to "pull" a weapon. The men continued to "fuss," and, as the victim turned around and began

4

to walk away, the Defendant picked up a fence post, raised it over his head, and brought it down "pretty hard" over the victim's shoulder. After being struck, the victim began to walk toward the road through Hurgis's yard, and the Defendant continued to follow him, so Shrum left the window to go outside.

As Shrum walked through the front door and onto the lawn, he saw the victim sitting on the ground in Hargis's yard. The Defendant, who had turned away from the victim, said, "I ought to kill him." Shrum said, "Hey," in a loud voice, and the Defendant walked toward his truck, got in, and drove away. Shrum then saw the victim, who was bleeding "really bad," stand up and slowly walk toward his home. Shrum followed the victim to his home to make sure "everything was ok." Later that day, he gave police a written, signed statement in which he recalled seeing the Defendant strike the victim a second time, in the head. At trial, Shrum reiterated that he did not see the Defendant hit the victim a second time and could not explain why his statement from February 2, 2007, stated that he had.

On cross-examination, Shrum said he had not met the victim before this incident, though Hargis had told Shrum that her next door neighbor, "Wayne," was her landlord and that she was distantly related to him. He estimated that the argument between the Defendant and the victim began about an hour after he saw the Defendant begin to erect the fence. Shrum explained that he was able to hear the argument, which he agreed involved loud arguing and cursing, because the two side-by-side windows from which he watched the argument were open. The Defendant continued to drive the fence posts into the ground as the two men argued, which angered the victim and prompted him to threaten to take the fence posts down himself and "take [the Defendant] to court." Shrum recalled a third man, Mr. Motes, who was helping the Defendant erect the fence, was near the men as they argued but stayed out of the fray. He estimated that the argument lasted three to four minutes before the Defendant struck the victim.

Betty Jane Privett, the victim's wife, explained that their daughter owned the house, rented by Hargis, that separated her and the victim's house from the Defendant's house. Privett grew up in the home she shared with her husband, and her daughter's house and the gravel driveway leading to it had been there as long as Privett could remember. The Defendant, whom she had known all her life, was friends with her brothers growing up and had been "in and out" of her house through the years. Their friendship cooled, however, after a particularly heated argument between the victim and the Defendant. One day, the Defendant, who was angry that the Privetts were keeping chickens in their yard, stood in his yard and screamed to the victim, who was standing in his own back yard, "I'll kill you and your chickens both." The victim and the Defendant continued to argue back and forth but shortly thereafter, and several months before the incident in this case, the victim removed the chickens from his yard. Privett did not know where her husband took the chickens, but she

5

confirmed they kept horses on land in Jasper, Tennessee, which her husband visited daily.

Privett testified that, on the day of this attack, she and her husband ate lunch, and her husband took a nap. When he woke up, he decided to go feed their livestock in Jasper and left the house with a small dog the couple kept as a pet. Privett recalled that the victim was not upset and that it was "just a regular day." She assumed her husband was on his way to Jasper, and she was talking to their daughter on the phone when, five to ten minutes later, she saw her husband "trying to crawl up the back steps[,] bloody as a stuck hog." Privett said this "scared [her] to death." Privett told her daughter "something's happened to your daddy," and hung up the phone on her daughter. She asked her husband, "What in the world happened?" to which her husband replied, "[The Defendant] hit me with a fence post." Privett said the victim was "all bent over like he was about to go down," and a "little boy," referring to Lucas Shrum, was with him.

Privett seated her husband at the kitchen table and wrapped a towel around his head, which was bleeding "terribly." Police and emergency responders arrived soon thereafter and rushed him to the hospital. Privett recalled that, throughout this time, the victim was drifting in and out of consciousness. She neither saw nor spoke with the Defendant the day of the attack.

The victim stayed at Erlanger Hospital in Chattanooga, Tennessee, for five days and afterwards stayed briefly at Siskin Hospital for rehabilitation therapy. When the victim returned home, he was weak, suffered from memory loss, and appeared to be in a great deal of pain.

On cross-examination, Privett confirmed that she and her husband filed a lawsuit against the Defendant for three million dollars for the medical bills and "pain and suffering" that resulted from this incident. She said her husband has experienced lower back pain since a 1993 truck wreck. Based on this wreck, the victim sued Wagner Freight, was declared seventy-five percent disabled, and had not worked since. Privett said her husband had used narcotic pain relievers to treat the pain from this lower back injury.

Privett said that her husband and the Defendant "went to court" over the Defendant's threat to kill her husband and his chickens but confirmed the court "talked to both of them" and took no further action. On redirect examination, Privett said the Defendant knew that her husband was disabled.

Wayne Privett, the victim in this case, testified that, on the day of this attack, he was backing out of his driveway when he noticed that the Defendant and Mr. Moats were driving fence posts into the driveway of the home his daughter rented to Hargis. The State

6

introduced a photograph of the driveway that showed fence posts placed squarely in the middle of the driveway leading to the rental home. This concerned the victim because the driveway provided the only road access to the rental home. Though the men had argued before, the Defendant had never complained to the victim about how his daughter or her renters used the driveway.

The victim got out of his vehicle and asked the Defendant what he was doing. He told the Defendant he had driven the posts too far onto his daughter's property, and the men began to argue. The victim agreed that he and the Defendant were swearing at one another during this argument. The victim said Mr. Moats did not participate in the argument and instead silently stood a short distance back. When the victim threatened to "take it to court," the Defendant said, "[T]his is [my] God— land and [I'm] going to take it." The victim said he decided at this point to walk away from the argument. He testified he was carrying nothing in his hands, and he did not threaten or make threatening gestures toward the Defendant. As the victim turned to leave, the Defendant struck the victim's shoulder, breaking his shoulder. As the victim tried to walk away from the Defendant, the Defendant said, "I'm tired of fooling with you, you sonofabitch, I'm going to kill you," and struck the Defendant's head. This broke the victim's neck and required seventeen stitches.

The victim briefly lost consciousness after being struck in the head. The first thing he remembered after being struck in the head was being down on his knees in the street. He testified that he believed the Defendant would have killed him had Shrum not emerged from the house and gotten the Defendant's attention. The victim did not remember walking to his back porch but did remember trying to crawl up his back steps to the kitchen and his wife and one other person helping him up the steps into the kitchen. Emergency responders soon arrived, and the victim continued to go in and out of consciousness as he was transported to the local armory and airlifted to Erlanger Hospital.

Reviewing copies of his medical records from Erlanger and Siskin Hospitals introduced by the State, the victim confirmed that, as a result of the attack, his shoulder was dislocated and his sixth cervical vertebrae was fractured. The victim received physical therapy for his shoulder injury but expected the injury to require surgery in the future. As of trial, he continued to experience severe shooting pain in his neck. He wore a neck brace for the vertebral fracture for several months. The victim confirmed that, in the course of his employment with Wagner Freight Line, he was in a serious wreck that left one woman dead, a man paralyzed, and himself with chronic lower back pain.

The victim confirmed he owned and kept fighting chickens in his yard but said the Defendant kept chickens in his yard as well. He confirmed that he moved the chickens to his farm in Jasper after the Defendant complained.

7

On cross-examination, the victim said he and the Defendant had been friends years back but that their relationship soured when the Defendant failed to finish paying him for hauling work the victim completed for the Defendant. The victim said that the Defendant gave him money at one point but that this money was in return for the hauling the victim had done and was not a loan.

The victim confirmed he kept about 250 chickens in a small building on his property. He denied that they had attracted flies, rats, or maggots, saying he poured quicklime to prevent infestation. He testified that he knew the Defendant had complained at the police station and at city hall about his keeping chickens. The victim agreed that the Defendant's complaints shocked him because the Defendant himself kept chickens on his property. He acknowledged he was aware at the time that a city ordinance prohibited keeping chickens.

The victim denied he said he would "tear the god— fence down" when he confronted the Defendant about the fence. He testified that he may have said he would remove the fence if the Defendant himself did not remove it. Though the victim could not remember everything he said to the Defendant, he recalled calling the Defendant a "little dough-bellied fat sonofabitch." He emphasized, however, that the Defendant had already begun swearing at him before he said this. The victim testified that he is six feet, one-and-a-half inches tall and weighs 230 pounds. He agreed that he is larger than the Defendant. The Defendant denied approaching the victim on the day of the attack with the intent of starting "trouble."

The parties stipulated to the following facts, which were determined in a hearing on the victim's disability status resulting from his 1993 wreck:

> [T]he [victim] sustained a permanent impairment of 20 percent to the body as a whole as a result of his cervical spine injuries, and an additional 15 percent to the body as a whole as a result of his lumbar spine injuries for an overall permanent impairment rating of 35 percent to the body as a whole.
> . . . [The victim] has sustained a permanent mental impairment of fifty-five percent to seventy-five percent to the body as a whole as a result of his injuries. . . . [The victim] has sustained a permanent physical impairment of 5 percent to the body as a whole as a result of his injuries.

The victim acknowledged having taken Prozac in the past for depression. He also acknowledged that he was aware at the time of his February 2 argument with the Defendant that the Defendant had been in bad health. He confirmed that he had filed a suit against the Defendant based on the injuries he sustained as a result of the Defendant's attack.

Sharon Privett Billingsley, the victim's daughter, testified that she grew up in her

parents' current house and moved into the home between their's and the Defendant's when she married in 1999. She recalled that, the same year she and her husband moved into the house, a dispute arose with the Defendant when she and her husband started erecting a chain link fence in their backyard. Although they had erected the fence where they believed the property line existed, the Defendant disputed their calculation of the property line. Rather than escalate the argument, Billingsley gave in and moved the fence to where the Defendant believed it should be.

Billingsley said that the gravel driveway between her and the Defendant's homes had been there "as long as [she could] remember" and that she and her husband had parked a boat and various cars and trucks they owned in the driveway when they lived there. She testified that the Defendant "never," either before or after the incident in this case, called her to complain about either her or her tenants' use of the driveway separating their properties.

Billingsley, a school counselor with a masters degree in community counseling, explained the mental disability rating her father received after the 1993 trucking accident. Recalling that the wreck killed a woman and left another person in a vegetative state, she testified that her father "had a very difficult time dealing with" the injuries the two people sustained, though her father was not at fault in the wreck. Billingsley said the woman's death was particularly traumatic for her father because he had seen the woman's body. She recalled that he had difficulty sleeping because he could not exorcize images of the dead woman from his mind at night. She, along with the rest of her family, encouraged her father to seek counseling for how to deal with the psychological pain he was dealing with, and he did so. Billingsley explained that his diagnosis of depression resulting from this, rather than any brain injury, was the basis of the mental disability rating he later received.

Billingsley confirmed that she was caring for her young child and speaking with her mother on the phone when her mother told her something had happened to her father and quickly hung up. Though initially unable to reach her parents, she sent her husband to the police department, found out what had happened, and eventually met with her mother to go to Erlanger, where her father had been transported. She described finding her father in "bad shape." When her father returned home, Billingsley began caring for him as well as her mother because, up until this incident, her father had been caring for her mother, who had suffered a serious illness. His injuries from this attack incapacitated him from resuming this care.

On cross-examination, Billingsley recalled that, in 1999, she and her husband believed the property line was two to three feet from where the Defendant insisted it was located. She reiterated that the Defendant never complained, either while she lived in the house or since, that the driveway lay on his property. Billingsley confirmed her father took narcotic pain

9

medication to treat lower back pain he suffered as a result of the wreck.

At the close of the State's proof, the Defendant moved for a judgment of acquittal, and the trial court denied the Defendant's motion.

The Defendant testified that, after serving two years in the army, he entered the merchant marines, which required him to travel internationally. He married and had two sons, and in 1980 bought the home he currently resided in on Birch Avenue in Marion County. He divorced from his wife but maintained the Birch Avenue home for his two sons, infrequently living in the house on his trips home. He moved permanently to this home when he retired from the merchant marines in 1987. Up until this point, he knew the victim and his family only in passing but the two men became friends when the Defendant settled into his home.

The Defendant testified that he lent the victim small amounts of money "several" times and a "larger amount" of money two times. He said the last of these loans occurred four years after he retired, presumably around 1991. The Defendant claimed to have never charged the victim interest on these loans. After the victim told the Defendant he did not have money to pay back one of these loans, the Defendant allowed the victim to pay him back by using his dump truck to "work a job" the Defendant had on Pittsburg Mountain. The Defendant recalled that he and the victim worked on the same job site, building a sawmill. The Defendant said he sometimes employed the victim when the victim was not otherwise employed.

The Defendant explained that he kept chickens on his property for about two and a half months after buying five chickens and a rooster for his grandsons, because initially they did not have a cage to house them in at their home. After the Defendant built his grandsons a cage at their home, he moved the fowl from his home into the new cage. He testified that, though the victim's brother-in-law kept chickens in the victim's backyard for years, he did not complain about the chickens until the victim started keeping more chickens after his brother-in-law died. The Defendant said the chickens were loud, smelled foul, and attracted flies, so he asked the victim to move them. After the victim refused, the Defendant complained to the chief of police, who told him they had received prior complaints about the Defendant's chickens and that they would ensure the chickens were gone within twenty-four hours. The chickens remained for another twelve to fifteen days, so the Defendant complained again to the chief of police. He later received a letter saying the victim had been cited and that the matter was settled.

The Defendant recalled that, after receiving the letter from police and seeing that the chickens still remained, he became frustrated. He explained that the odor and the flies he

encountered entering and leaving his home were so bothersome that he began hanging towels over his front and back doors in an attempt to block the smells and flies from his home. Frustrated with this state of affairs, in April or May 2006, he again confronted the victim who told him that the chickens were "none of [his] damn business." The Defendant then threatened to shoot the victim's chicken and suggested he would harm the victim, too, if the victim tried to protect the chickens. The Defendant estimated that, after this confrontation and about three to four weeks after he initially complained to police, the victim finally removed the chickens from his property.

The Defendant said Christy Hargis, Billingsley's tenant, moved into the house next door to the Defendant in 2007. The Defendant was not personally acquainted with Hargis, though he had known her grandmother "ever since [he could] remember" and had watched Hargis's mother grow up. Hargis from time to time brought her young son over to greet the Defendant. The Defendant said Hargis had several friends who regularly visited her house. When these visitors arrived, Hargis's car was normally already parked in the driveway. In order to park in front of Hargis's car, the visitors often drove their cars partially up the driveway, over onto the Defendant's property, coming very close to his front porch, and then back onto the gravel driveway in front of Hargis's car. The Defendant feared that Hargis's visitors would strike his porch causing the rafters of his home to sag. He asked Hargis to prevent her visitors from using his property to get around her car.

The morning of February 2, 2007, the Defendant saw a car again use his property to get around Hargis's car. A visitor whom the Defendant recognized drove the car, but Hargis was seated in the passenger seat. He walked to the corner of his porch and asked Hargis's visitor why she had just driven on his property when he had asked her not to do so. According to the Defendant, Hargis, in a profanity-laced response, told the Defendant that her visitor drove through his property because she told her visitor to drive around her car. The Defendant asked Hargis why she did so in light of his request to not drive on his property, and Hargis told him to speak with the victim about his complaint. The Defendant responded that it was her and not the victim who was "driving across [his] yard," and he drove to the police station to report the incident.

The Defendant testified that when he arrived and spoke with Officer Schaublin, he indeed asked the officer to visit Hargis and threaten to arrest her if she continued to allow her guests to trespass on the Defendant's property. Officer Schaublin refused and encouraged the Defendant to seek a warrant. The Defendant testified that he did not want to file a warrant because doing so would ruin his relationship with Hargis's grandmother and parents. He explained, "What kind of a man would I be to have a granddaughter put in jail, what kind of a relationship would I have with them after that?"

11

As to whether he told Officer Schaublin he would kill the next person to drive onto his property, the Defendant said he told the officer that, "used to," a person could defend his property without being arrested. He admitted he said to the officer, "[Y]ou know, use[d] to a man just kept pushing you, people pushing you, you'd take a pick handle or some kind of a club and just rail the hell out of him," but he denied saying he would kill anyone. He acknowledged that he was "a bit perturbed" that the officer refused to speak with Hargis, only instructing the Defendant to file a warrant. The Defendant confirmed that, when he suggested erecting a fence to keep Hargis and her visitors out, the officer approved of his idea.

The Defendant left the police station and drove directly to Lowe's where he bought eight to ten fence posts and a post driver. He did not buy fencing wire because he intended only to erect the posts, which would be more than enough to keep Hargis's friends from entering onto his yard. On his way back, he stopped at his friend Paul Moats's house, who agreed to accompany him to his house and help him erect the fence. Moats's role was to ensure the posts were even and to provide physical assistance to the Defendant, who had suffered two heart attacks and a stroke.

In order to lay the fence posts in a straight line, the men attached one end of a string to the end of Billingsley's back yard fence and the other to a pin in the ground near the road that marked where surveyors had twice before concluded the Defendant's property began. The Defendant then drove the first fence post into the ground about three inches into his property from where the pin stood.

As the Defendant was facing the houses, preparing to drive the second post into the ground, the victim approached him from behind and said, "You G.D. potbellied son-of-a-bitch, you ain't putting no fence up." The Defendant testified that, after telling the victim cursing was unnecessary, he reminded the victim that the victim had known about the boundary lines the Defendant's surveyor's had pinned down for some time. He said he explained his concern that Hargis's visitors, who he did not believe were insured, would knock down a corner of his porch, requiring him to repair his porch and rafters. He also complained that he did not like her visitors' headlights "coming right though [his] living room window." The victim told the Defendant he would "tear that G.D. fence down"

The Defendant said the victim continued "cussing" him, calling him "every kind of one that you could think of," and then began somewhat secretively "sideling around" in his top right-hand pocket. Believing the victim was reaching for a gun, the Defendant said he tried to stay close to the victim, so he could knock a gun from the victim's hand were he to brandish one. The Defendant testified that the victim then turned around clockwise and that he continued to follow the victim as he walked away. According to the Defendant, the victim

12

then said, "Your mother had to be a whore to have a son-of-a-bitch like you," and then "made a motion to pull his hand out of his pocket." He said Moats had already backed away from the scene and onto the porch because he believed the victim was carrying a gun. The Defendant testified he knew he "had to do something" because "anybody that's facing a man that's got his hand in his pocket knows that if he ain't a little . . . scared, why then he ain't human." The Defendant said this was when, in order to "get his attention," he raised the fence post and hit the victim on his right shoulder, causing the victim to stumble toward the road. According to the Defendant, as the victim knelt near the road, his hand remained in his pocket, so, in order to "get his attention" and "get that hand away from that," the Defendant turned over the fence post and hit the victim on the left side of his head. The Defendant explained that he used the fence post rather than his own fists to strike the victim because he was already carrying the fence post and because the victim was a larger man in better health.

The Defendant said that, after he hit the victim over the head, the victim "got his hand away from that pocket" and looked up at the Defendant. The Defendant recalled that he let the victim walk toward his house and watched him until he got about twenty feet away, estimating that he could run if the victim stopped and pulled out his gun from that distance. The Defendant said that, because the fence post he used to strike the victim sliced his hand, the fence post bore more of his blood than that of the victim. As the Defendant turned back toward his home, he threw the fence post down, and told Moats to go "stay warm" inside the Defendant's house while the Defendant drove to the police station to report the incident.

On his way to the police station, the Defendant picked up one of his sons from work to accompany him to the police station. The Defendant testified that, when he arrived at the station and told Officer Shaublin what he had done, "the only thing that policeman wanted to do was to jump on the radio on his shoulder and run outside, get a tablet, get a book and start . . . saying, you ain't under arrest right now, but you don't need to say nothing." The Defendant continued trying to tell the officer what had transpired, but his son as well as the officer told him to stop talking.

The Defendant testified that he did not intend to kill the victim, saying, "Everybody was mighty free with that kill word, but you know, one of the Ten Commandments is thou shalt not kill."

On cross-examination, the Defendant testified that the gravel driveway between his and Hargis's home did not exist when he bought his home in 1980. He explained that the family who lived in the home at that time parked on the front lawn. When a tree grew over where the family had been parking their cars and began to drip sap onto the cars, the family started parking between the two houses. The Defendant acknowledged Billingsley testified the gravel driveway had been there since before 1980 and said he had no reason to believe

Billingsley was a dishonest person.

The Defendant testified that, in the years leading up to this incident, he was often at home because he was retired and had undergone several surgeries. He said he and the victim were not initially well acquainted, saying they only became friends years after he bought his home in 1980.

The Defendant confirmed that, to the best of his knowledge, the victim never complained to police about his storing chickens because police never spoke with him about the chickens he stored or asked him to move them. He acknowledged that one day he yelled across Hargis's yard to the victim that he would "kill" the victim's chickens if he did not get rid of them. The Defendant agreed that the victim's chickens "got gone" around March or April 2006. He denied complaining to Deputy Higdon about the victim's chickens when the deputy stopped him eight months later, which was two to three weeks before this incident. He also denied telling the deputy either someone had to "do something" about the chickens or that he was going to "knock[] someone over the head" if they did not move the chickens. He claimed that, after the deputy advised him his lights were not turned on, he merely asked the deputy about his family.

The Defendant explained that, over the course of using the driveway to access Billingsley's house, a "rut" was worn on the Defendant's side of the driveway, near the road. He recalled that twice, when surveying his property, officials indicated his property began in the middle of this rut. The Defendant said Hargis and her visitors frequently drove over this rut, which meant they drove over what he understood to be the property line and into his yard. He acknowledged the victim himself had never driven on this area. He also agreed that the person who drove onto his property the day of this incident was Hargis's friend, not the victim, his daughter, or Hargis herself. He explained that he never complained to Billingsley about Hargis and her visitors because he understood that the victim took care of issues regarding Billingsley's property.

The Defendant recalled that, when he went to the police station to complain about Hargis and her visitors driving on his property, Officer Schaublin did not mention making a report about his complaint, refused to go speak with Hargis, and encouraged the Defendant to take out a warrant against Hargis. According to the Defendant, Officer Schaublin told the Defendant they had received complaints that "something [was] going on" at Hargis's home and implied they wanted a reason to arrest Hargis. The Defendant acknowledged he told Officer Schaublin that "in the old days," he would have resolved the trespassing issue by attacking the trespasser: "I said in the old days if somebody kept doing you that way, people would take a pick handle or a club or something and whip hell out of somebody and solve the problem. They didn't have to come down to the police department, they'd solve it

14

theirself [sic]." He also acknowledged telling the officer that "in the old days" one would break the kneecaps of anyone, man or woman, "if it was necessary." He denied saying that hitting a person in the face repeatedly with a pick ax handle was acceptable "in the old days." The Defendant acknowledged he told the officer that, "in the old days," a quick, urgent arrest was not necessary for a person who dealt with a problem in the manner he described because such a person simply would turn himself in.

The Defendant testified that, when the victim approached him as he was facing his home and driving the second fence post into the ground, the victim was "very upset." He explained that, at this point, the three men were all on his lawn, because the line he and Moats strung from the back fence to the survey pin forced the victim to walk around the line and into the Defendant's lawn in order to speak with the Defendant. He denied hitting the victim from behind, saying the victim was facing him each time he struck the victim. He explained he had been careful to stay within two to three feet of the victim in order to knock a gun out of the victim's hand, should he brandish one. According to the Defendant, he raised the fence post and swung it sideways, striking the victim's shoulder "hard enough to get [the victim's] attention" but not "very hard." Doubled over, the victim then stumbled toward the road, and the Defendant followed him and struck him again in the head. The Defendant acknowledged that a metal fence post is "very rigid" but said he did not know whether one could kill a person by striking him with a fence post.

The Defendant denied that he went to the police station after this incident for the purpose of turning himself in for striking the victim, insisting that he went for the purpose of reporting that the victim tried to pull a gun on him. The Defendant also denied telling Officer Schaublin he struck the Defendant's head. Asked whether he ever inquired as to the victim's well being after this incident, he responded only that at the police station he said, "What about [the victim]," and an officer told him they had found a blood trail leading to his back porch.

Brian David Johnson, the Defendant's son, confirmed that his dad stopped at the restaurant where Johnson worked on his way to the police station after this incident. According to Johnson, his father told him that the victim had a gun or a knife in his pocket. He described his father as "very agitated and nervous and upset" at this time. He confirmed he accompanied his father to the police station and that his father did not stop talking about the incident until both he and Officer Schaublin had warned him multiple times against making incriminating statements.

On cross-examination, Johnson said that when his father came by the restaurant, he told Johnson he had struck the victim with a metal post because the victim "was verbally threatening" and because he believed the victim was carrying a gun or knife. The Defendant,

15

however, did not say he saw a knife or a gun. Johnson confirmed that his father never mentioned his belief that the victim was carrying a weapon when he spoke with Officer Schaublin at the police department.

The defense hired Eddie Campbell, a licensed land surveyor, to determine the boundary line between the rental lot and the Defendant's lot. Campbell testified that, based upon the deeds for each property and the City of South Pittsburg map to which each referred, the property line began where the Defendant erected the first fence post. On cross-examination, he said that approximately one foot and four inches of the rental home's gravel driveway encroached on the Defendant's property, but the main portion of the driveway was on the rental property's lot.

Paul Earl Moats testified he had known the Defendant around twenty-five years. He confirmed that, on February 2, 2007, he agreed to help the Defendant erect a fence, and the Defendant picked him up and drove him to the Defendant's house. He explained that, given his poor health, his role was simply to help keep the fence posts in a straight line. He recalled that, as they were erecting the second fence post, the victim, with whom Moats was not previously acquainted, walked across the rental home's yard and stopped in the driveway, in front of where the two men had been working. He confirmed that the victim used expletives to tell the Defendant he was "not going to put the fence up," and, when the victim insisted that he would erect the fence, the Defendant called him a "little dough-bellied S.O.B."

Moats testified that, as the men continued to argue, the victim began "holding his hand down in front of his pocket," which indicated to Moats that the victim was about "to pull a gun out and kill [himself and the Defendant]." Moats cautiously turned away from the argument and walked to the front porch. When he reached the porch and turned back toward the arguing men, he saw the victim kneeling down in the road, with the Defendant standing above him, holding a fence post in the air. The Defendant then turned around, lowering the fence post, and threw the post to the ground. He then walked toward his truck, telling Moats to go inside his home to stay warm, explaining that he was going to the police station. Moats confirmed he gave a statement to police about this incident, that "Chief Garner" handwrote a summary of his statement, and that he signed Chief Garner's written summary.

On cross-examination, Moats explained he never saw a bulge in the victim's pocket, and he never saw the victim reach into or even touch his pocket. He said the victim's hand was simply hovering in front of the pocket. Moats testified that the Defendant was the only one using coarse language in the argument.

On redirect examination, the defense introduced the written statement Chief Garner

16

prepared summarizing Moats's recollection of the incident. This statement sets forth that Moats said he was afraid the victim had a gun because the victim "had his hand in his pocket."

On recross-examination, Moats disagreed with the portion of the statement that suggested he saw the victim put his hand in his pocket.

Mike Cardin confirmed he employed the services of both Defendant and the victim in constructing a sawmill for six months between 2001 and 2002. Both men helped him haul off dirt with a dump truck. Cardin had known the Defendant for a number of years and said the Defendant was always honest in their business dealings. On cross-examination, Cardin testified he had known the victim for the same amount of time he had known the Defendant and said the victim was also a "very honest" man. Three other witnesses, Bob Bynum, Terry Case and Frank Thomas, testified they had known the Defendant for some length of years and considered the Defendant a friend who had always been truthful toward him and had a reputation for truthfulness in the community.

Ester Troutman testified that at the time of this incident, she lived across the "alley" from the victim. According to Troutman, the smell from the victim's chickens was "quite a nuisance," especially in hot or rainy weather. She testified she knew the Defendant because he had been friends with her late husband. She said that, since her husband's death, the Defendant had made himself available to help with household tasks and bills. She testified that she knew the Defendant to be an honest person.

At the close of proof, the jury convicted the Defendant of attempted voluntary manslaughter.

### B. Sentencing Hearing

The following proof was presented at the Defendant's sentencing hearing: the Defendant's presentence report indicated the Defendant had no prior criminal convictions, though a search of the NCIC database revealed a 1991 assault charge. After dropping out of high school in the twelfth grade and later receiving a certificate of completion, the Defendant enlisted in the army for two years, during which time he received an engineering certification. He then worked for Sun Oil Company from 1952 until he retired in 1987. The Defendant was seventy-eight years old at the time of sentencing.

The presentence report contained several victim impact statements from the victim, his wife, Betty Privett, and his daughter, Sharon Billingsley. The victim's statement described feeling nervous, fearful, and anxious as a result of being attacked by the

Defendant. He said his injuries had left him with sleeplessness and pain "all over [his] upper body and head." Both the victim's wife and daughter described the victim as an extremely changed man who no longer could participate in family life, such as playing with his grandson and caring for his wife's health.

Both the victim and his wife, in their respective statements, recalled two incidents that had occurred since trial: First, the Defendant, despite being ordered to have no contact with the victim and his family, walked onto the victim's front lawn and "had a few choice words" with their daughter, who was visiting them. The Defendant also verbally attacked new renters, who had moved into Billingsley's rental home, threatening "to take them to court."

Billingsley testified at the sentencing hearing, describing the exchange between her and the Defendant described in her parents' victim impact statements: She said that, sometime in August 2008, when renters from out of town were moving into her rental home, she, along with her six-year-old son, parked at her parents' house and checked on the renters. As she prepared to get back into her car, she heard someone call her name. She turned around to see the Defendant standing in her parents' yard. He appeared very agitated and asked Billingsley whether she had told the new renters about the property line. She replied that she had not, and began telling her son to get in the vehicle. He asked who the man was, and, when Billingsley refused to answer, repeating her command to her son to get in the vehicle, her son grew afraid and began asking, "Mama, is that T.D. Johnson?" Billingsley said she herself began to grow afraid, explaining she believed the Defendant was not to have any contact with her family.

Billingsley said that, after this confrontation, she began crying and the new renter's son, having observed the confrontation, walked over to check on her. He reported to her that, earlier in the day, the Defendant had confronted him as well, so she explained to him that the Defendant was very defensive of his property, showed him the property line, and cautioned him against letting even a wheel pass over onto the Defendant's property. As she was doing this, she realized that a small portion of the front tire of a U-Haul truck the renters were using to move their belongings had passed over into the Defendant's yard. She had not seen this earlier in the day and had not thought to warn the tenants against crossing into the Defendant's property.

Betty Privett, the victim's wife, reviewing medical bills, confirmed that her husband incurred $48,130.82 in medical expenses due to his injuries stemming from the Defendant's attack.

Judy T. York, who lived next door to the Defendant with her husband, on the side opposite Billingsley's rental home, testified that she had seen the Defendant in the past keep

chickens on his property. She also recalled that a fence separated her and the Defendant's yard until the Defendant tore this fence down. Because the Defendant had argued with her and her husband about the location of the property line separating their properties, she and her husband had surveyors map her property line and lay "survey stubs" to mark it. The Defendant and an assistant, however, removed these stubs and built a wall on her side of the property line. She recalled hearing the Defendant say to his assistant, "I know I'm going to have trouble about it, but go ahead and do what I told you to do." She testified that, though she was pregnant during this time, the Defendant came over and "real[ly] aggressively" told her that the property he had built the wall over was his.

Mrs. York testified that the Defendant had also long complained that limbs from her and her husband's trees hung over his yard. He eventually cut the limbs, which she acknowledged was within his rights as a property owner. She soon, however, noticed that one of her trees had died and, upon closer inspection, found that someone had placed poison on the dead tree's roots.

On cross-examination, Mrs. York testified that her lot was fifty feet wide and that the wall the Defendant erected was one foot into her property. She confirmed that the surveyors who mapped the Defendant's property in preparation for trial concluded the property line to lie exactly along the wall the Defendant erected, but she insisted this conclusion was incorrect. She estimated that the arguments she had with the Defendant happened about four years before sentencing.

Edward R. York, Judy York's husband, testified that the Defendant once brought a man to his property and told the man to cut down a tree in the Yorks' yard. From inside his house, Mr. York saw what was happening, walked outside, and asked the Defendant what was going on. The Defendant responded that he was "cutting the damn tree down," and Mr. York told him he could only trim, not cut down, the tree, which was on the Yorks' property. The man whom the Defendant had brought to cut down the tree then climbed down from the tree, saying he was "not going to get involved in this." Mr. York summoned police and repeated his position that the Defendant could trim the limbs but not cut the tree down. The Defendant offered to pay to remove the tree, but Mr. York refused to allow the Defendant to cut down the tree. After he and his wife later found that one of the trees had died, he asked the Defendant "what happened" to the tree, and the Defendant shrugged as if to say he did not know. During one particularly heated argument about the tree, the Defendant said to Mr. York, "Well, you know, I've been in the Merchant Marines, and I know[] how to cut a man on the back of his legs where he can't walk again."

Mr. York confirmed that the Defendant kept chickens in his yard. He said the Defendant did not take care of the chickens, recalling that grass grew up around the pens,

smothering the chickens, and that he did not provide the chickens with water. He recalled seeing dead chickens in the pen.

On cross-examination, Mr. York confirmed that the surveyor he and his wife commissioned to map their property line concluded the Defendant's wall lay one foot into their property. He cautioned them, however, against making an issue of the minor encroachment in order to preserve peace in the community. He estimated that the Defendant erected the wall about five or six years before sentencing and that he poisoned the tree about a year later.

Cheryl Godsby, whose home is directly across the street from the Defendant's home and down the street from the victim's home, testified that she was sitting on her porch when Billingsley's new renters moved in sometime in August 2008. She recalled seeing the Defendant step onto his own porch and, without "any agitation or anything," tell the new renters he wanted to "stop the problem before it started" and show them the property line. She then saw the Defendant leave his house in his truck and stop in front of the victim's home and tell Sharon Billingsley, who was standing in the front yard, to show her renters the property line. Godsby reported that this exchange between Billingsley and the Defendant "sounded like a normal conversation" but allowed that she was not well acquainted with either party. She testified that the Defendant had always been very nice to her.

On cross-examination, Godsby acknowledged she was not able to hear the entire conversation between the Defendant and Billingsley. She did not recall whether Billingsley was trying to get her son to get inside her vehicle while she and the Defendant spoke. She recalled seeing Billingsley speaking with her renters a short time later, but did not remember whether Billingsley was accompanied by her son at this time.

Richard Lamay testified that he came to know the Defendant when the Defendant began dating his mother when he was eighteen years old. Around this time, Lamay's thirteen-year-old wife had a baby who required constant heart monitoring. Lamay and his wife were living with their baby at his mother's house. He testified that the Defendant was very concerned about the baby and watched the baby "probably just as much as [he himself] did." Also, the Defendant co-signed on the first trailer he and his wife bought.

Lamay explained that, as his own father died when he was nine, the Defendant had become like a grandfather to his two children. He explained that the Defendant had been "very good" to his oldest son, taking him fishing and allowing him to spend the night at his house. Lamay testified that his oldest son called the Defendant "Pawpaw" as a young child and calls the Defendant every other night to "cut up and stuff."

20

Eddie Lavaugh Moore testified he had known the Defendant twenty to twenty-five years. He testified that he knew the Defendant "fairly well" and that he was at one point commander of the American Legion, during which time he made several improvements to the properties, adding windows, building floors, and making general repairs. He also confirmed that the Defendant was on the Senior Citizen Housing Board. On cross-examination, Moore confirmed he was not aware of the events that transpired between the victim and the Defendant.

Andy Lamay, Richard Lamay's oldest child, testified that he was in his third year at Chattanooga State and that he was studying to be an elementary school teacher. He testified that, besides his parents, the Defendant had been the most influential person in his life. He recalled that the Defendant had helped him out financially and that, when he was younger, he would take him hunting or fishing. He said the Defendant also occasionally gives him money to play golf with. He testified that the Defendant had been a positive influence in his life.

On cross-examination, Andy Lamay agreed that the Defendant could "sometimes have a bit of a temper."

Defense counsel informed the trial court the Defendant had applied for judicial diversion but had not yet received a response from the TBI as to whether the TBI would certify him as eligible for diversion. The State indicated that it had received a communication from the TBI that it could not certify the Defendant for diversion based upon an unresolved Marion County criminal charge.

At the conclusion of the hearing, the trial court took the matter under advisement and later issued a written order sentencing the Defendant to three years, sixty days of which were to be served in the Marion County jail. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant challenges the trial court's denial of his motion for a judgment of acquittal, its imposition of sixty days of confinement, and its denial of judicial diversion. We address each challenge below.

### A. Judgment of Acquittal and Sufficiency of the Evidence

The Defendant contends the trial court erred when it denied his Motion for Judgment of Acquittal at the close of the State's proof and again at the close of proof. He argues that,

21

because the Defendant struck the victim only twice and then allowed the victim to walk away, his conduct did not constitute an attempt under Tennessee Code Annotated section 39-12-101(a)(2) or (3) because it was inconsistent with an intent to kill the victim and did not amount to a "substantial step" toward killing the victim. He argues that, due to the Defendant's leniency, his "entire course of conduct" was not "corroborative of the intent" to kill the victim, a necessary aspect of a "substantial step" under subsection 101(a)(3). The parties agree that the form of criminal attempt defined in subsection 101(a)(1) does not apply to the Defendant's conduct.

The State responds that the Defendant's conduct falls more squarely within subsection 101(a)(2), which identifies acts intended to cause a victim's death accompanied by the belief that the acts will cause the victim's death with no further conduct on the defendant's part. The State argues that not only the Defendant's statements of his intent to kill the victim both before and during the attack but also the reasonable certainty that beating the victim's head with a metal fence post would cause his death show the Defendant intended to kill the victim.

Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R.Crim. P. 29(a). This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See generally Overturf v. State*, 571 S.W.2d 837 (Tenn.1978). By presenting evidence, however, a defendant generally waives his ability to appeal a trial court's denial of his motion for a judgment of acquittal. *Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007) (declining to revisit *State v. Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979)). However, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *see also State v. Blanton*, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996).

As for the defendant's first motion, he waived his right to appeal its denial when he chose to offer proof. *See Finch*, 226 S.W.3d at 317. However, the defendant's second motion for judgment of acquittal was made at the close of all proof, and, accordingly, we will

address the sufficiency of the evidence supporting the Defendant's attempted voluntary manslaughter conviction. *See Thompson*, 88 S.W.3d at 614-15. In doing so, we will address all evidence, not just that brought during the State's case-in-chief.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view

of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was indicted for attempted first degree murder but convicted of the lesser-included offense of attempted voluntary manslaughter, a Class D felony. T.C.A. § 39-13-211(b) (2006). *State v. Dominy*, 6 S.W.3d 472, 477 (Tenn. 1999) (classifying attempted voluntary manslaughter as a lesser-included offense of attempted first degree murder). Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a).

A person commits a criminal attempt where, "acting with the kind of culpability otherwise required for the offense," acts in one of the following ways:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believed them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense if the circumstances surrounding the conduct were as the person believed them to be; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a) (2006). In order to commit attempted voluntary manslaughter, therefore, a defendant must either (1) intentionally engage in conduct that would cause the victim's death if the circumstances surrounding the conduct were as the person believed them to be; (2) act with intent to cause the victim's death if the circumstances surrounding the conduct were as the person believed them to be; or (3) act with intent to cause the victim's death, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense. T.C.A. § 39-13-211(a); T.C.A. § 39-12-101(a). A person acts intentionally when he has the "conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-

302(a) (2006).

As explained above, the Defendant argues he abandoned his attack against the victim and that this abandonment both prevented his conduct from amounting to a "substantial step" toward killing the victim, as defined in subsection 211(a)(3), and showed he did not intend to kill the victim, as defined in subsection 211(a)(2). We disagree.

The evidence at trial showed that, well before the attack in this case, the Defendant developed an animosity toward his neighbor, the victim. He resented the victim's practice of keeping chickens, and he believed the victim failed to repay to him a debt. Early in the summer of 2006, the Defendant reported the victim for keeping chickens in his yard, a practice contrary to local law. At some point before the victim removed the chickens, the Defendant, standing in his own yard, screamed to the victim, "I'll kill you and your chickens both!" During a January 2007 exchange between the Defendant and his friend, a South Pittsburg police officer, the Defendant's rage and violent ideations again surfaced. He told his friend that, if police did not "do something" about the Defendant's chickens, he would "bust [the victim] up side of the head and come turn himself in." So furious was the Defendant that he told the officer he did not mind going to jail because he was "fed up" with the situation. According to both the victim's and his wife's testimony, however, they had already removed the chickens when this exchange occurred.

In the context of these events, a month before this attack, the Defendant fixated upon the Billingsley's renter's habit of driving over his yard and allowing her visitors to do the same. He repeatedly complained to the renter, who apparently refused to alter her behavior. On the morning of February 2, the Defendant again saw the renter with one of her visitors drive through his yard and promptly complained to the two women. The renter told the Defendant to speak with the victim about his grievance, indicating she would not stop until the victim told her to do so. Rather than complain to the victim, the Defendant, who was "very agitated" and "irate" drove to the police station around 11:00 a.m. and complained to Officer Schaublin. The Defendant rejected the officer's suggestion that he file a formal report, saying that, if anyone crossed over his property again, he would "just take a pick ax handle and hit him[,] and when he fell on the ground[,] he would hit him in the head." The officer attempted to discourage the Defendant from responding violently, but the Defendant told the officer that, if he received a report that something had happened at the Defendant's house, to "take [his] time in getting to there" because he would "turn himself in."

At the officer's suggestion, the Defendant prepared to build a fence to separate his property from the renter's driveway, buying supplies and enlisting a friend's help. About two hours after his conversation with Officer Schaublin, he and his friend began driving fence posts into the renter's driveway, along what the Defendant believed to be his property line.

25

When the victim noticed that the victim was erecting a fence that would obstruct the rental driveway, he walked into the rental yard, stopped where the men worked, and confronted the Defendant. A heated argument arose between the Defendant and the victim, with the victim calling the Defendant several profane names, and culminating in the Defendant declaring, "This is [my] God— land and [I'm] going to take it."

The victim decided to abandon the argument and turned to walk away. According to both the victim and Lucas Shrum, who watched the argument from inside the rental home, the victim was carrying nothing in his hands and did not reach into his pocket for anything as he turned to walk away. Thus, the Defendant was not, as he testified, attempting to knock a gun from the victim's hand when he then raised a fence post over his head and brought it down violently over the victim's shoulder. As the victim collapsed, the Defendant said, "I'm tired of fooling with you, you sonofabitch, I'm going to kill you," and struck the Defendant again, this time in the head. Shrum ran outside to intervene in time to hear the Defendant say, "I ought to kill him." The Defendant then dropped the fence post, got into his truck, and drove to the police station.

At the police station, the Defendant, who was "cool as a cucumber," explained to officers that he and the victim began to argue, and, when the victim began "cussing" him, the Defendant "got tired of it" and hit the victim with a fence post.

The Defendant presented testimony that the victim was reaching into his pockets during the argument, thus leading the Defendant to believe he was armed and prompting the Defendant's attack. The jury apparently did not find this testimony credible. We will not on appeal second-guess this credibility determination. *See Bland*, 958 S.W.2d at 659.

The Defendant's explicit threats to kill the victim, made both to the victim and to police, show that the Defendant formed the "conscious objective or desire" to kill the victim at least one month before this incident. *See* T.C.A. § 39-11-302(a). The morning of the attack, he told Officer Schaublin specifically that, the next time someone trespassed on his land, he would strike the person and that, once the person was on the ground, he would strike the person again. Indeed, within two hours, he beat the victim with a metal fence post, exclaiming, "I'm going to kill you!" and, after the victim fell to the ground, he struck the victim again, this time in the head. After Lucas Shrum interrupted the scene, the Defendant walked away from the victim saying, "I ought to kill him." Shortly thereafter, the Defendant calmly explained to police that he struck the victim because he "got tired of it." Given the Defendant's extraordinarily descriptive threats, the parallel between his threats and the manner in which he carried out the attack, and the Defendant's calm demeanor after the attack, we conclude that the Defendant's statements show he acted with an "intent to cause the victim's death." *See* T.C.A. § 39-13-211(a).

26

Further, we conclude the Defendant's actions constituted a "substantial step" toward causing the victim's death. The Defendant argues he retreated from the attack by walking away after hitting the victim "only" twice. However, as evidenced by the life-threatening injuries the victim sustained, hitting a person once on the shoulder and again on the head in and of itself constitutes a substantial step toward killing the person, without regard to whether the assailant subsequently abandons his attack. We conclude the Defendant took a substantial step toward killing the victim when he approached the victim from behind, struck him in the shoulder, and struck the victim's head as he lay on the ground. As such, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the Defendant, with intent to kill the victim, took a substantial step toward killing the victim, thus committing attempted voluntary manslaughter. *See Jackson*, 443 U.S. at 319. He is not entitled to relief on this issue.

## B. Sentencing

The Defendant has several objections to the sentence he received. The Defendant first calls attention to the trial court's failure to rule explicitly on his request for judicial diversion. Next, he challenges the trial court's application of enhancement factors as well as its rejection of certain mitigating factors. While the Defendant does not contest the length of his sentence, he argues the trial court's improperly denied full probation based on these factors. He alleges several other improper grounds for the trial court's denial of full probation, as well.

## 1. Judicial Diversion

The Defendant contends the trial court incorrectly disregarded his request for judicial diversion and that the Tennessee Bureau of Investigation ("TBI") issued a letter to the court certifying his eligibility for judicial diversion. The State responds that the record on appeal contains neither a request for judicial diversion nor the TBI letter mentioned in the Defendant's brief. The State argues, in light of this absence of proof, this issue is not properly before this Court.

Our review of the trial transcript shows that the Defendant applied for judicial diversion before sentencing but was informed at sentencing that the TBI could not yet certify his eligibility due to an unresolved Marion County charge. The trial court sentenced the Defendant in February 2009, by written order, to a sentence of split confinement. In January 2010, by agreed order, the parties supplemented the appellate record with a copy of the Defendant's application for judicial diversion accompanied by a certification from the TBI, dated December 2009, that the Defendant had no prior convictions or outstanding charges.

The Defendant argues the trial court erred when it sentenced him to split confinement in its written order without explicitly addressing his request for judicial diversion. We note that, as of the time the trial court sentenced the Defendant, the TBI had not certified his eligibility for judicial diversion, citing an unresolved charge. Thus, nothing in the record indicates to us that the trial court had the statutory authorization to grant the Defendant's request for judicial diversion. *See* T.C.A. § 40-35-313(a)(3)(A) (2009). Thus, the trial court properly denied judicial diversion. The Defendant is not entitled to relief on this issue.

## 2. Denial of Full Probation

The Defendant argues the trial court erred when it denied him a full probation sentence because it relied on inapplicable enhancement factors and ignored applicable mitigating factors in doing so. He also attacks the trial court's conclusions about the circumstances of the offense and the Defendant's lack of remorse and candor, which it relied upon in denying full probation.

The State responds that the trial court sentenced the Defendant within the applicable range and properly based its denial of full probation on the Defendant's poor rehabilitative potential, as evidenced by the circumstances of the offense and the Defendant's lack of both remorse or candor. It argues that the trial court also properly relied on the applicable enhancement and mitigating factors in denying full probation but that, its consideration of these factors aside, its reliance on the Defendant's poor rehabilitative potential alone sufficiently supports its denial.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2003). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. This means that, if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, T.C.A. § 40-35-103 (2006), we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). Specific to the review of the trial court's finding enhancement and mitigating factors, "the 2005 amendments deleted as grounds for appeal

28

a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). The Tennessee Supreme Court continued, "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

In conducting a de novo review of a sentence, we must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing, (4) the arguments of counsel relative to sentencing alternatives, (5) the nature and characteristics of the offense, (6) any mitigating or enhancement factors, (7) any statements made by the defendant on his or her own behalf and (8) the defendant's potential or lack of potential for rehabilitation or treatment. *See* T.C.A. § 40-35-210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

To meet the burden of establishing suitability for full probation, a defendant must demonstrate that full probation will subserve the ends of justice and the best interests of both the public and the defendant. *State v. Blackhurst*, 70 S.W.3d 88, 97 (Tenn. 2001). The following criteria, while not controlling the discretion of the sentencing court, shall be accorded weight when deciding the defendant's suitability for full probation: (1) the nature and circumstances of the criminal conduct involved; (2) the defendant's potential or lack of potential for rehabilitation; (3) whether a sentence of full probation would unduly depreciate the seriousness of the offense; and (4) whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes. T.C.A. §§ 40-35-103(1)(B), -103(5), -210(b)(4) (2006); *see also Blackhurst*, 70 S.W.3d at 97.

In this case, the Defendant is eligible for full probation because his sentence is ten years or less (subject to certain statutory exclusions not relevant here). T.C.A. § 40-35-303(a) (2006). Although full probation must be automatically considered by the trial court as a sentencing alternative whenever the defendant is eligible, "the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303(b), Sentencing Comm'n Cmts.

We note first that, as the State correctly argues, a trial court need base its denial of full probation on only one of the four factors mentioned above in order to properly deny full probation. Thus, the improper application of enhancement factors or lack of consideration of mitigating factors does not detract from the legitimacy of an otherwise well supported imposition of confinement. For reasons explained below, the trial court based its denial of full probation on two of the above factors. As such, we will not address the Defendant's objections to the enhancement and mitigating factors applied by the trial court.

In this case, the trial court sentenced the Defendant to three years and ordered him to serve sixty days in the Marion County jail. In the lengthy explanation of its sentencing determinations contained in its written order, the trial court discussed enhancement and mitigating factors and then addressed the subsection 103(1)(B) factors. It found that, based upon the circumstances of the offense and the Defendant's lack of truthfulness and remorse, full probation was not appropriate in this case. The trial court noted that, were the Defendant younger, it would have imposed a greater jail term.

We conclude that the evidence does not preponderate against the trial court's finding that the circumstances of the offense required a term of confinement. *See* T.C.A. § 40-35-210(b)(4). The Defendant made multiple, specific threats against the victim and carried out those threats. The victim, who had to be airlifted to Erlanger Hospital, suffered a broken shoulder and a fractured vertebra as a result of this attack. He underwent weeks of hospitalization and rehabilitation, and his physical activities are now severely and permanently limited. Thus, the evidence does not preponderate against the trial court's finding that the circumstances of the offense warranted some confinement. *Ross*, 49 S.W.3d at 833.

Likewise, the record supports the trial court's finding with respect to the Defendant's rehabilitative potential. *See* T.C.A. § 40-35-103(5). The Defendant told police before he attacked the victim that the prospect of being arrested would not deter him from attacking the Defendant. Immediately after turning himself in, he unrepentantly told police he struck the victim because he was "tired of it." He expressed no remorse then and, at trial, at least implicitly insisted his conduct was justified because, in his youth, people resolved disputes with violence. He testified at trial that the victim crossed over onto his land during the dispute and was fumbling around in his pocket, leading the Defendant to believe he would brandish a firearm. Given the testimony of both the victim and Lucas Shrum, the Defendant's testimony appears not to be credible. Thus, the record does not preponderate against the trial court's finding that the Defendant lacked both remorse and truthfulness. *See id*.

The trial court based its denial of full probation upon its sound findings that the Defendant lacked remorse and candor and that the circumstances of the offense suggested confinement was appropriate. *See* T.C.A. §§ 40-35-103(5), -210(b)(4). Thus, and because the Defendant has failed to demonstrate that full probation will subserve the ends of justice and the best interests of both the public and himself, we conclude the trial court properly denied the Defendant full probation, ordering him to serve sixty days in the Marion County jail. *See Blackhurst*, 70 S.W.3d at 97. He is not entitled to relief on this issue

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude the evidence was sufficient to support the Defendant's conviction, and the trial court properly sentenced the Defendant.  As such, we affirm the judgment of the trial court.


_____

ROBERT W. WEDEMEYER, JUDGE

**Court Memorandum**

**To:**        **All Interested Parties**

**From:**     **Robert W. Wedemeyer, Judge**

**Date:**     **April 28, 2011**

**Re:**       **State v. Thomas David Johnson, M2009-01761-CCA-R3-CD**

In State v. Thomas David Johnson, filed on November 24, 2010, the appeal number was listed as M2009-01761-CCA-R3-PC. While it appears that the correct appeal number, M2009-01761CCA-R3-CD, is in JITS, as evidenced by the Supreme Court's list denying review, this correction memo will serve to change the appeal number on the opinion.